## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| MANUEL ("MANNY") MARTINEZ, JR., and KATHLEEN ("KATIE") MARTINEZ, individually and on behalf of all others similarly situated,<br><br>    Plaintiffs,<br><br>v.<br><br>GENERAL MOTORS, LLC, ONSTAR, LLC, LEXISNEXIS RISK SOLUTIONS, INC., and VERISK ANALYTICS, INC.,<br><br>    Defendants. | Case No. _____<br><br>**CLASS ACTION COMPLAINT AND JURY DEMAND** |

Plaintiffs Manuel ("Manny") Martinez, Jr., and Kathleen (Katie) Martinez ("Plaintiffs") bring this Class Action Complaint against Defendants General Motors, LLC; OnStar, LLC; LexisNexis Risk Solutions, Inc.; and Verisk Analytics, Inc., (collectively, "Defendants") on behalf of themselves and all others similarly situated. Plaintiffs make the following allegations based upon personal knowledge as to their own actions and upon information and belief as to all other matters.

## <u>NATURE OF THE ACTION</u>

1.    This case stems from GM and OnStar's longstanding surreptitious collection and sale of customer driver behavior data (the "driver data" or "telematics") without Plaintiffs' and Class Members' knowledge or consent.

2.      OnStar is installed in every car GM has produced since 2015, and has been a standard feature (not optional) since 2022. Customers typically have access to OnStar through a vehicle-specific app (myBuick, myCadillac, myChevrolet or myGMC), or through their online account with GM. Among the suite of programs offered by OnStar, which can be accessed and controlled through these apps, is Smart Driver or Smart Driver+ ("Smart Driver").

3.      OnStar's Smart Driver embedded technologies and sensors are capable of collecting and do collect all manner of data related to driving behavior for each vehicle trip, including a record of acceleration events, hard brake events, high speed events, distance traveled, time of day traveled, vehicle information such as VINs, and sometimes location data and GPS data.

4.      The stated purpose of Smart Driver is to track the driver's driving habits for their "own safety," but, unbeknownst to Plaintiffs or Class Members, GM shared this driver data with consumer reporting agencies LexisNexis and Verisk. The data was subsequently packaged by LexisNexis and Verisk and sold to insurance companies where, due to a multitude of factors including lack of context and inaccurate data, it severely harmed GM's customers including Plaintiffs and Class Members.

5.      GM's clandestine data sharing practices had apparently been operating in secret until late 2023, when elements of these practices were first exposed by a

Mozilla Foundation Report, followed by a Congressional inquiry, and ultimately a *New York Times* investigative report published on March 11, 2024.

6.     In the aftermath of the *New York Times*' article, GM announced on March 22, 2024 that it would stop sharing driver data with LexisNexis and Verisk. On April 24, 2024, GM announced it was discontinuing the OnStar Smart Driver program altogether, and all drivers would automatically be unenrolled from the program.

7.     Although GM claimed to only collect and share driver data with insurance companies with the customers' "express consent," GM routinely violated its promises to customers and its own Privacy Policy and Terms of Service by secretly sharing the driver data with data brokers such as LexisNexis and Verisk, who analyzed the data to assign a driver report score, like a credit score, which it then sold to insurance companies, resulting in premium increases, inflated quotes, and insurance rejections.

8.     Importantly, for Class Members who knowingly enrolled in OnStar's Smart Driver or Smart Driver+ program, GM did not adequately disclose how driver data would be used, and did not obtain consent for the sharing of personal and identifiable driver behavior data with third-parties, including insurance companies.

9.     Specifically, on the FAQ for the "Smart Driver" program, GM represented that it would not share driver data with insurers without the customer's

"express consent." No terms in GM's Terms of Service, Privacy Policy, or other documents would constitute "express consent" to sell customer data to insurance companies and data brokers. To the contrary, many of these documents and terms foreclose any ability for GM to surreptitiously sell this data.

10.    But worse, GM also collected driver data from Class Members who did not "opt in" to the Smart Driver program at all. Even though these customers had not enrolled in the Smart Driver program or had opted out, GM sent their data to data brokers such as LexisNexis or Verisk.

11.    GM's about-face decision to stop selling this driver data shortly after the *New York Times* articles exposed its deficient privacy practices, and further supports that its customers were not aware of GM's surreptitious data collection and sharing.

12.    Moreover, the driver data that Defendants collected and sold was flawed and was often inaccurate or incomplete. Defendants understood that this flawed driver data would likely be relied upon by insurance companies in deciding whether to provide insurance and in calculating insurance premiums, yet they sold it anyway.

13.    Millions of GM customers who had no knowledge that their data was being sold have been harmed. Many, including Plaintiffs and Class Members, have seen massive increases in their insurance premiums or outright rejections of

coverage as a result of GM's data sharing practices.

14.   Plaintiffs and Class Members had a reasonable expectation of privacy in their driver data and no reason to suspect it was being secretly logged and sold by their car's manufacturer.

15.   Plaintiffs and Class Members suffered immediate harm from increased insurance premiums, are suffering and are likely to suffer long-term harm from ongoing increased premiums, as well as the loss of their driver data. As such, Plaintiffs and Class Members are entitled to compensatory, consequential, statutory, punitive, general, and nominal damages, disgorgement and restitution, and injunctive relief as described below.

## **PARTIES**

16.   Manuel ("Manny") Martinez, Jr., is a resident and citizen of Kansas. Plaintiff Manny Martinez is a current owner of a GMC Yukon, model year 2023, manufactured by GM and equipped with technology manufactured by OnStar and operated or maintained by Defendants. Plaintiff Manny Martinez is a former owner of a GMC Yukon, model year 2019, manufactured by GM and equipped with technology manufactured by OnStar and operated or maintained by Defendants.

17.   Plaintiff Kathleen ("Katie") Martinez is a resident and citizen of Kansas. Plaintiff Katie Martinez is and was a co-buyer with Plaintiff Manny Martinez of the 2023 GMC Yukon identified above, which was manufactured by

GM and equipped with technology manufactured by OnStar and operated or maintained by Defendants.

18.    Defendant General Motors, LLC ("GM") is a limited liability company organized under the laws of the State of Delaware, with its headquarters and principal place of business in Detroit, Michigan. GM manufactures and sells vehicles in the United States and across the world, including Chevrolet, GMC, Cadillac, and Buick branded vehicles.

19.    Defendant OnStar, LLC ("OnStar") is a limited liability company organized under the laws of the State of Delaware, with its headquarters and principal place of business in Detroit, Michigan. OnStar is a subsidiary of GM and provides communications, security, emergency services, navigation, diagnostics, and information services to GM vehicles in the United States and across the world. Among the services OnStar provides to GM is the "OnStar Smart Driver" system.

20.    Both GM and OnStar are wholly owned by General Motors Holdings, LLC. Defendants General Motors and OnStar are collectively referred to herein as "GM" or the "GM Defendants."

21.    Defendant LexisNexis Risk Solutions Inc. ("LexisNexis") is incorporated under the laws of the State of Delaware and has its headquarters and principal place of business in Alpharetta, Georgia.

22.    LexisNexis is a global data and analytics company that provides data

6

and technology services, analytics, predictive insights, and fraud prevention for a wide range of industries, including the automotive industry.

23.    Defendant Verisk ("Verisk") is a Delaware corporation with its headquarters and principal place of business in Jersey City, New Jersey. Among other things, it is a consumer reporting agency that is governed by the FCRA.

## JURISDICTION AND VENUE

24.    This Court has federal question jurisdiction pursuant to 28 U.S.C. §1331 because this case arises out of violations of federal law.

25.    Subject matter jurisdiction over this lawsuit is also appropriate under the Class Action Fairness Act, 28 U.S.C. § 1332(d), because this is a proposed class action in which: (1) there are at least 100 class members; (2) the combined claims of class members exceed $5,000,000.00, exclusive of interest, attorneys' fees, and costs; and (3) Defendants and at least one class member are citizens of different states.

26.    Jurisdiction arises over Plaintiffs' supplemental state claims under 28 U.S.C. §1367.

27.    This Court has personal jurisdiction over GM Defendants because their corporate headquarters and principal place of business are located in the State of Michigan. This Court has personal jurisdiction over the LexisNexis and Verisk Defendants because they transact business in Michigan, are admitted to do business

in Michigan, do regularly conduct business in Michigan, maintain substantial contacts in Michigan, and have intentionally availed themselves of the markets within Michigan through their business activities, particularly their business relationships with the GM Defendants, from which these claims arise.

28.    Venue is proper in this district under 28 U.S.C. § 1391(b) because GM Defendants reside within and are headquartered in this district, LexisNexis has offices on Troy, Michigan, a substantial part of the events giving rise to the claims at issue occurred in this district, and Defendants are all subject to the personal jurisdiction of this Court.

## FACTS RELEVANT TO ALL COUNTS

### A. GM's Data Collection Practices.

29.    Beginning with model year 2015, all GM vehicles available for lease or sale in the United States have been equipped with OnStar software and tracking technologies.

30.    OnStar's software and technologies are essential to its core business, which consists of selling subscription-based services to GM vehicle owners and lessees.

31.    The OnStar software installed in GM vehicles is capable of collecting, recording, and transmitting data via GPS (for purposes of navigation, reporting emergencies, etc.) and OBD-II (On Board Diagnostics). OnStar's services rely

primarily on its embedded telematics software, which transmits data directly from a customer's GM vehicle to OnStar.

32.    Using OnStar software, GM drivers may access a suite of safety and connectivity-focused services, including roadside assistance, automatic crash response, remote vehicle access, and turn-by-turn navigation.

33.    Previously, OnStar's subscription-based plans were available to GM users for a fee. In June of 2022, however, GM began including three-year pre-paid OnStar services as standard mandatory options in Buicks, Cadillacs, and GMCs for $1,500, which was included in the Manufacturer's Suggested Retail Price (MSRP); drivers did not have a choice as to whether their vehicle would have OnStar services.[1]

---

[1] As the Detroit Free Press reported in August 2022, the automaker tacked $1,500 onto many new vehicles' prices to cover the connectivity package. Although listed under "options", GM confirmed the package was not optional, but was actually standard equipment. "Providing this connectivity standard is more convenient for our customers and provides a more seamless onboarding experience," said GM spokesman Patrick Sullivan in an email to the Free Press in 2022. "The package has been offered as optional in the past, but going forward, it is standard on all Buick and GMCs." *See* Jamie L. LaReau, *GM calls $1,500 Onstar plan optional—but new car buyers are being forced into it*, DETROIT FREE PRESS (Aug. 9, 2022), *available at*: https://web.archive.org/web/20240402004133/https://www.freep.com/story/money/cars/general-motors/2022/08/09/gm-onstar-connected-services-plan-cost-option/10246244002/ (last accessed May 8, 2024); *see also* Jamie L. LaReau, *GM faces 2nd lawsuit over driver data collection without consent*, DETROIT FREE PRESS (March 29, 2024), *available at*: https://web.archive.org/web/20240416034400/https://www.freep.com/story/money/cars/general-motors/2024/03/29/gm-lawsuit-driver-data-collection-without-consent/73143189007/ (last accessed May 8, 2024).

34.     OnStar offers GM drivers access to various programs, including OnStar Smart Driver or Smart Driver+ ("Smart Driver"), a program promoted as an "optional service" that can provide drivers with unique insights about their driving behavior in order to "maximize their vehicle's overall performance, reduce vehicle wear and tear and encourage safer driving." There is no charge for enrollment in Smart Driver.[2]

35.     To encourage driver participation in the Smart Driver Program, OnStar promises to provide drivers with unique insights and monthly summaries, while promoting opportunities to complete specific challenges and earn "achievements" or "badges."

36.     With Smart Driver, OnStar collects and stores a variety of information from the customer's vehicle, including driver behavior data (telematics). The telematic data collected includes the driver's mileage; average speed; percentage of time the driver exceeds 80 miles per hour; driver's frequency and intensity of acceleration and braking; seat belt usage; late night driving; and when and where these events occur. This information is collected from each vehicle and stored after each drive.

---

[2] *See Help: OnStar Smart Driver*, ONSTAR.COM, *available at*: https://web.archive.org/web/20240505162214/https://www.onstar.com/support/faq/smart-driver (version accessed April 24, 2024) (accessed date reflects that OnStar's website, including its FAQs as cited herein, have been modified over the last several weeks).

37.     OnStar uses GM's vehicle-specific connected car applications, such as MyChevrolet, MyBuick, MyCadillac, and MyGMC, (the "Vehicle Apps") allowing users to interact with Smart Driver and additional features and services, such as remote vehicle access and connectivity with, i.e., Amazon's Alexa and Google.

38.     The Vehicle Apps are mobile apps that sync to the GM vehicle after users download the application and log into their OnStar account.

39.     The Vehicle Apps can be used to turn off the vehicles' Smart Driver interface, but do not completely shut down the OnStar software's processes for recording and transmitting driver behavior data.

40.     GM instructs that customers can enroll in Smart Driver, check enrollment status, or change enrollment status through their Vehicle App or through their Account on the vehicle brand website. Per GM, with any enrollment option, users must consent to GM's User Terms for Connected Vehicle Services ("User Terms") and Connected Services Privacy Statement ("Privacy Statement").

41.     GM claims that it does not automatically enroll drivers in OnStar, that it is an "optional" application, and that OnStar does not collect driving behavior data without consent.[3] But these representations have been shown to be false. GM and OnStar track, collect, intercept, store, transmit, and profit from sharing driver

_____

[3] *See Help: OnStar Smart Driver*, ONSTAR.COM, *available at*: https://web.archive.org/web/20240505162214/https://www.onstar.com/support/faq /smart-driver (last accessed May 8, 2024).

behavior data with third parties, whether or not a driver consents.

**B. GM's Surreptitious Data Collection, Sharing, and Reselling Practices Are Exposed.**

42.    The GM Defendants' scheme was first exposed when the Mozilla Foundation published the results of its in-depth investigation entitled "After Researching Cars and Privacy, Here's What Keeps Us up At Night" in September 2023.[4]

43.    Mozilla's investigative reporters concluded that "[m]odern cars are surveillance-machines on wheels souped-up with sensors, radars, cameras, telematics, and apps that can detect everything we do inside—even where and when we do it." In fact, car companies "have so much information about you that they can (and do) use it to invent even more, through 'inferences.' . . . Then, a lot of the car companies share and sell that information—to service providers, data brokers, the government, and other businesses we know little or nothing about. . . . But there's more: the intimacy of the data . . . There is some personal information that

---

[4] Jen Caltrider, Misha Rykov, and Zoe McDonald, *After Researching Cars and Privacy, Here's what Keeps Us up at Night*, MOZILLA FOUNDATION (Sept. 6, 2023), *available at*: https://foundation.mozilla.org/en/privacynotincluded/articles/after-researching-cars-and-privacy-heres-what-keeps-us-up-at-night/ (last accessed May 8, 2024); *see also* Jenn Caltrider, Misha Rykov, and Zoe McDonald, *What Data Does My Car Collect About Me and Where Does It Go?*, MOZILLA FOUNDATION (Sept. 6, 2023), *available at*: https://foundation.mozilla.org/en/privacynotincluded/articles/what-data-does-my-car-collect-about-me-and-where-does-it-go/ (last accessed May 8, 2024).

corporations just should not be allowed to collect about you, especially when there is no imaginable good reason for them to do it. In this category: genetic information. GM's Cadillac, GMC, Buick, and Chevrolet say in their California Privacy Statement that they can collect (among so many other things) your 'Genetic, physiological, behavioral, and biological characteristics.'"[5]

44.     Mozilla's investigative report sparked a Congressional investigation in which automakers, including GM, were questioned by Senator Ed Markey (D-Mass.) about their data collection use and disclosure practices. In a letter urging the Federal Trade Commission (FTC) to investigate automakers' data practices, Senator Markey warned that "most automakers [including GM] refused to disclose whether they transfer data for commercial benefit."[6]

45.     GM submitted a 9-page response to the Senator's inquiry. In response to the question "**Does your company collect user data from its vehicles, including**

---

[5] Jen Caltrider, Misha Rykov, and Zoe McDonald, *After Researching Cars and Privacy, Here's what Keeps Us up at Night*, MOZILLA FOUNDATION (Sept. 6, 2023), *available at*: https://foundation.mozilla.org/en/privacynotincluded/articles/after-researching-cars-and-privacy-heres-what-keeps-us-up-at-night/ (last accessed May 8, 2024).

[6] Senator Markey, *Letter to FTC on Auto Privacy* (Feb. 27, 2024), *available at*: https://www.markey.senate.gov/imo/media/doc/senator_markey_letter_to_ftc_on_auto_privacy__022824pdf.pdf (last accessed May 8, 2024); *see Automakers' Responses to Senator Markey's Nov. 20, 2023 letter on privacy* (Feb. 28, 2024), *available at*: https://www.markey.senate.gov/imo/media/doc/automaker_responses_to_sen_markey_letter_on_privacy_-_022824pdf.pdf (last accessed May 8, 2024).

**but not limited to the actions, behaviors, or personal information of any owner or user?**" GM responded: "If a customer opts in to Connected Services, then yes, GM collects vehicle data."[7] GM's answer is excerpted below:

1. **Does your company collect user data from its vehicles, including but not limited to the actions, behaviors, or personal information of any owner or user?**

Central to GM's approach is keeping customers in control of their connectivity, maintaining transparency in our data practices, and safeguarding personal information.

If a customer opts in to Connected Services, then yes, GM collects vehicle data.

In a set of rare cases where safety is concerned, we also currently have the ability to collect limited data from Vehicles whose owners have not opted-in to Connected Services to respond 1) if a user initiated an OnStar button press and 2) for safety-related alerts in specific models.

    a. **If so, please describe how your company uses data about owners and users collected from its vehicles. Please distinguish between data collected from users of your vehicles and data collected from those who sign up for additional services.**

Depending on vehicle hardware and software availability, GM currently uses data collected from Vehicles whose owners have opted in to Connected Services. Here are some examples of how that data would be used:

- To support the Connected Services that the owner requests to receive from GM.
- To provide functionality for GM in-vehicle applications and to understand the use of certain in-vehicle applications.
- To provide functionality within GM mobile applications.
- To administer in-vehicle infotainment profiles.
- To communicate with owners about their Connected Services or other available Connected Services.

---

[7] *Automakers' Responses to Senator Markey's Nov. 20, 2023 letter on privacy* (Feb. 28, 2024), *available at*:
https://www.markey.senate.gov/imo/media/doc/automaker_responses_to_sen_markey_letter_on_privacy_-_022824pdf.pdf (last accessed May 8, 2024).

- To respond to safety-related alerts in specific models.
- To facilitate over-the-air updates.
- To research and develop new products or services; evaluate and improve products or services; and identify and troubleshoot issues.
- To comply with legal or regulatory requirements; to protect its rights; and to detect, investigate, and prevent fraud or other illegal activity.
- For purposes of participation in low carbon fuel standard programs.
- To ensure safe operation of vehicles, provide owners service-related notifications on behalf of GM and its dealers.
- With separate consents from the owner, OnStar Insurance may provide offers of auto insurance discounts to eligible drivers and to provide insurance quotes.

As mentioned above, in a set of rare cases where safety is concerned, we also currently have the ability to collect limited data from Vehicles whose owners have not opted-in to Connected Services to respond 1) if a user initiated an OnStar button press and 2) for safety-related alerts in specific models.

46.    In response to Question 1.e., regarding the sale, transfer, or sharing of

data collected from GM vehicles, GM stated:[8]

e. **Does your company sell, transfer, share, or otherwise derive commercial benefit from data collected from its vehicles to third parties? If so, how much did third parties pay your company in 2022 for that data?**

If an owner opts in to Connected Services, GM has the ability to share data collected from Vehicles with third parties, as outlined in our US Connected Services Privacy Statement. For example, data might be shared to help emergency responders respond more quickly and accurately, to support in-vehicle services utilized by the owner, and where the owner directs GM to do so (such as helping owners optimize their charging patterns). For those limited data shares where there is a commercial benefit attributable directly to the data sharing, the impact to GM's overall 2022 revenue was de minimis.

47.    Question 3 focuses on consent(s) with respect to data collection, and

GM's response specifies that separate consents are required for services such as

Smart Driver:[9]

---

[8] *Id.*

[9] *Id.*

**3.  Does your company provide owners or users an opportunity to exercise consent with respect to data collection in its vehicles?**

Yes, central to GM's approach is keeping customers in control of their connectivity, maintaining transparency in our data practices, and safeguarding personal information. Owners must opt-in to Connected Services. In a set of rare cases where safety is concerned, we also currently have the ability to collect limited data from Vehicles whose owners have not opted-in to Connected Services to respond 1) if a user initiated an OnStar button press and 2) for safety-related alerts in specific models.

**a.  If so, please describe the process by which a user is able to exercise consent with respect to such data collection. If not, why not?**

GM collects user data from Vehicles through the use of Connected Services. At the point of new vehicle sale or lease, the owner is presented with information about Connected Services and prompted to accept or decline the US Connected Services Privacy Statement. Owners who elect not to complete this process at the dealership or through other GM provided channels then have 30 days to accept the US Connected Services Privacy Statement or cellular connectivity is disabled. In order to connect a disabled vehicle, the owner must contact GM to re-activate the vehicle by double pressing the OnStar blue button from inside the vehicle and speaking with an advisor, who will send the consumer the US Connected Services Privacy Statement for review and acceptance as part of Connected Services being activated.

GM also provides separate consents for specific service offerings that may collect additional vehicle data, such as Smart Driver.

. . .

When users use GM in-vehicle applications, they must accept the applicable privacy statement for that application.

GM Vehicles with Android-based infotainment systems also utilize Android run-time application permissions ("Permissions"), which is a system that prevents in-vehicle applications from accessing certain vehicle data such as vehicle location and contacts stored in the infotainment head unit ("IHU"), unless a consumer expressly grants an application permission to access the data.

If a user connects a Vehicle to an external Wi-Fi network, the user must review and accept the US Connected Services Privacy Statement prior to connection.

If a user creates an in-vehicle profile, the user must review and accept the US Connected Services Privacy Statement prior to profile creation.

When a user's phone is paired with the vehicle, the user must approve the connection before vehicle data is collected for certain Vehicles.

48.     In response to Question 3.b., regarding users who consent to services, GM notes that only "a small percentage of new vehicle owners do not opt-in to receive Connected Services."[10]

49.     GM's responses omit any mention of its sale of driver data to consumer

---

[10] *Id.*

reporting agencies such as LexisNexis or Verisk.[11]

50.    Nevertheless, GM did sell driver data to data brokers, including LexisNexis and Verisk, for their own business benefit and profit. GM knew or should have known that data brokers could and would sell this information to other companies, including insurance carriers, which they did.

51.    The Congressional Investigation was followed by another in-depth article entitled "Automakers Are Sharing Consumers' Driving Behavior With Insurance Companies" in which privacy investigator Kashmir Hill of the New York Times concluded that "[s]ome drivers of General Motors cars…may not realize that their driving data is being shared with insurance companies" and that "LexisNexis, which generates consumer risk profiles for the insurers, knew about every trip G.M. drivers had taken on their cars, including when they sped, braked too hard or accelerated rapidly."[12]

52.    Indeed, as detailed in the *New York Times* on March 11, 2024, insurance companies admit they have relied on driver data to raise the cost of car insurance or deny coverage altogether.[13]

---

[11] *See id.*
[12]  Kasmir Hill, *Automakers Are Sharing Consumers' Driving Behavior With Insurance Companies*, NEW YORK TIMES (Mar. 11, 2024), *available at*: https://www.nytimes.com/2024/03/11/technology/carmakers-driver-tracking-insurance.html (hereinafter, NYT article, March 2024).
[13] *Id.*

53.     Further, at least some of the driver data that insurers use to price their products came from data brokers who received the data from GM and OnStar themselves.[14]

54.     The article includes instructions for "How to Find Out What Your Car is Doing," which encourages drivers to: (1) see what data their car is capable of collecting at https://vehicleprivacyreport.com; (2) check their enrollment status on their connected car app; (3) search "privacy request form" alongside the name of their vehicle's manufacturer for instructions on how to request information; (4) request their LexisNexis report at https://consumer.risk.lexisnexis.com/consumer; and (5) request their Verisk report at https://fcra.verisk.com/#/.[15]

55.     A follow-up piece, published on April 23, details Kashmir Hill's own journey in discovering that, unbeknownst to her or her husband, their GM car had generated hundreds of pages of reports detailing their trips and driving behavior and shared that with LexisNexis and Verisk.[16] Although GM assures consumers that this data collection occurs only when drivers turn on OnStar and enroll in Smart Driver, the author had connected their car to the MyChevrolet Vehicle App to see if they

---

[14] *Id.*

[15] *Id.*

[16] Kashmir Hill, *How G.M. Tricked Millions of Drivers Into Being Spied on (Including Me)*, New York Times (Apr. 23, 2024), *available at*: https://www.nytimes.com/2024/04/23/technology/general-motors-spying-driver-data-consent.html (hereinafter, NYT Article, April 2024).

were enrolled, and it said that they were *not* enrolled—the Smart Driver enrollment was toggled off. However, they requested and received reports from LexisNexis (which detailed 203 trips) and Verisk (which detailed 297 trips) on trips they had taken in the few months since they had purchased the car. Mr. Hill then logged into the browser-based version of his account page on GM.com, which said their car *was* enrolled in OnStar Smart Driver+. Per the *New York Times*, "GM says this discrepancy between the app and the website was the result of 'a bug' that affected a 'small population' of customers." As Ms. Hill noted, "[t]hat group got the worst possible version of Smart Driver: We couldn't get insights into our driving, but insurance companies could."[17]

56.     And these reports were terribly flawed and contained inconsistent data. the *New York Times* piece revealed that although both of the Hills drove their car, the reported data inured only to one of the drivers (Mr. Hill) because the GM dealership had listed him as the primary owner.

### C. Public Outcry and Litigation Prompts GM to Stop These Practices.

57.     GM and OnStar claim to have secured drivers' consent for collection and dissemination of this driving data. But this is belied by the fact that many drivers have not knowingly consented to terms or notices related to the Smart Driver program *because they did not affirmatively enroll in it*. Even for those drivers who

---

[17] *Id.*

consciously opt-in to services like the Smart Driver service, this purported consent is obscurely placed in the fine print of lengthy and ambiguous user terms and privacy policies, effectively concealing the existence of GM and OnStar's partnerships and the full scope of data sharing.

58.    Neither GM nor OnStar provides consumers with any disclosure that their driver behavior data is being or will be collected, gathered, stored, transmitted, or sold to third parties. Nor do GM or OnStar disclose that they share or sell driver data to LexisNexis and Verisk, who then resell it for profit to automobile insurers, which results in higher insurance quotes, premiums, or rejections.

59.    Instead, GM's and OnStar's terms and policies prominently proclaim their commitment to data privacy, and the online FAQ regarding the Smart Driver program promises that "GM takes the security of its customers' data very seriously."[18]

60.    GM said it would stop collecting customers' driving data after a lawsuit, filed on March 13 in the U.S. District Court Southern District of Florida, accused GM, OnStar and data and analytics company LexisNexis of violating privacy and consumer protection laws. *See Chicco v. GM*, et al., No. 9:24-cv-80281-DMM (S.D. Fla.).

---

[18] *See Help: OnStar Smart Driver*, ONSTAR.COM, *available at*: https://web.archive.org/web/20240505162214/https://www.onstar.com/support/faq/smart-driver (version accessed Apr. 24, 2024).

61.     As reflected on OnStar website: "[a]s of March 20, OnStar Smart Driver customer data is no longer being shared with LexisNexis or Verisk. Customer trust is a priority for us, and we are actively evaluating our privacy processes and policies."[19]

62.     Although GM declined to respond to Senator Markey's inquiry concerning the revenue GM realized from its sharing of data with LexisNexis in Verisk, the *New York Times* suggests that annual revenue is in the millions, according to an employee familiar with the contracts.[20]

63.     Nevertheless, as of April 29, 2024, GM has indicated that it "is discontinuing the Smart Driver product across all GM vehicles and will automatically unenroll any customers currently enrolled in Smart Driver." GM expects that "customers will be unenrolled automatically by June 26, 2024," and that this change is based on "customer feedback."[21]

### D. GM's Terms of Service and Privacy Policies Do Not Permit the Sale of Plaintiffs' Driver Data to Data Brokers or Disclose that Such Data Will be Sold to Insurance Companies or Other Third Parties.

---

[19] *Id.* (version accessed April 26, 2024); *see also* Jamie L. LaReau, *GM cuts ties with 2 data firms amid heated lawsuit over driver data*, DETROIT FREE PRESS (Mar. 22, 2024), *available at*: https://www.freep.com/story/money/cars/general-motors/2024/03/22/gm-data-firms-lexis-nexis/73057931007/ (last accessed May 8, 2024).

[20] NYT Article, April 2024.

[21] *See Help: OnStar Smart Driver*, ONSTAR.COM, *available at*: https://web.archive.org/web/20240505162214/https://www.onstar.com/support/faq/smart-driver (last accessed May 8, 2024).

64.     The disclosures embedded in GM's user terms and privacy policies fail
to transparently acknowledge the extent of its data sharing.

65.     The first page of GM's nine-page, single-spaced January 2023 privacy
policy summarizes the "key points" of the privacy statement, stating that GM "may
collect," "may use," and "may share" drivers' information.

66.     Regarding collection, the policy summary states:

- **Collection:** When you interact with us or use the Connected Services, we may collect information
  about you and your vehicle, such as name, address, email address, phone number, vehicle
  identification number (VIN) and vehicle location, use, driving, and performance data. We may also
  collect various types of information about you from independent third parties who provide
  information to us such as automotive dealers.

67.     The text of the policy clarifies the information that "may" be collected
"*when you access or use the Connected Services and otherwise with your consent,*"
which includes, among many other things, "demographic data or protected
classification information, gender, password, PIN, emergency contact information
…voice biometric information . . . billing information, your credit card number,
CVV code and expiration date," and, "in limited circumstances," a "Social Security
Number." The text of the policy also states that information such as "geolocation,
route history, driving schedule, speed, air bag deployments, crash avoidance alerts,
impact data, safety system status, braking and swerving/cornering events, event data
recorder (EDR) data, seat belt settings, vehicle direction (heading), audio or video
information such as information collected from camera images and sensor data,

voice command information, stability control or anti-lock events, securing/theft alerts, and infotainment (including radio and rear-seat infotainment) system and WiFi data usage" "may" be collected.

68.    Regarding the use of such information, the policy summary states:

- **Use:** We may use your information to develop, enhance, provide, service, maintain, and improve the safety, security, and quality of our products, programs, and services, and for product research and marketing

69.    The text of the policy provides twenty bulleted points explaining how GM may use a driver's information. It also clarifies that GM "may de-identify your information in a way that it can't reasonably be associated with you or your vehicle, and maintain and use such de-identified information or share it with third parties for any legitimate business purpose." Nothing in the "use" section of the privacy policy would indicate to a reasonable consumer that their un-de-identified information would be used in the manner described in this complaint.

70.    Regarding the sharing of such information, the policy summary states:

- **Sharing:** We may share your information within GM, with automotive dealers, licensees, and companies with whom we enter into business relationships, in order to develop, enhance, provide, service, maintain, and improve the safety, security, and quality of our products, programs, and services, to respond to your requests, to allow recipients to use it for marketing, and as required or permitted by law. In some instances, we may ask you for consent or de-identify your information before sharing it.

71.    The text of the policy clarifies that GM "may share the categories of your information described above…with business [sic.] that GM enters into business relationships, such as SiriusXM, in connection with their products and services;

23

research institutes, for research and development purposes (For example, improving highway safety); or dealers, fleet or rental car companies, for service or maintenance of your vehicle. We may also share data with third parties for marketing activities (with necessary consents) or where you have elected to receive a service from them and/or authorized them to request data from GM (for example, financial organizations who offer financing for the purchase or lease of GM vehicles or usage-based insurance providers)."

72.     Nothing in the "sharing" section of the privacy policy would indicate to a reasonable consumer that their information, including driver behavior information, would be shared in the manner described in this complaint, *i.e.*, with LexisNexis and Verisk for purposes of generating consumer reports and data points to be sold to insurance companies.

73.     Regarding safeguarding of information, the privacy policy states:

**HOW WE SAFEGUARD YOUR INFORMATION**

We maintain reasonable technical, administrative, and physical security and confidentiality measures designed to help protect your information from unauthorized access or use.  We also require (other than in certain emergency situations) third party service providers acting on our behalf or with whom we share your information to provide similar security and confidentiality measures.

74.     OnStar's User Terms for Connected Vehicle Services (updated May 1, 2018) states that, "[w]hen You accept the user Terms during our sign-up process or when You access or use the Services . . . [You are] bound by these User Terms," including the Privacy Statement. Further, "You are not permitted to access or use

24

any of the Services if You do not agree to be bound by the Agreement."

75.    The User Terms refer to the Privacy Policy, noting that "GM collects, uses, and shares information from and about You and your Vehicle. The GM Privacy Statement describes what GM does with that information. You consent to the collection, use, and sharing of information described in the Privacy Statement and in any revisions to the Privacy Statement."

76.    GM's user terms of service and privacy policies are vague, convoluted, and contradictory, and were designed to obscure GM's data collection, use, and sharing practices.

77.    The disclosures that are contained within GM's terms and policies are inadequate given the scale and scope of GM's data harvesting.

78.    The User Terms refer to multiple other documents and links, which it purports to incorporate and which purport to be binding.

79.    Even for those Class Members who reviewed and agreed to them, GM and OnStar's terms and policies fail to adequately disclose or notify Plaintiffs and Class Members that GM was collecting, sharing, and selling driver data in the manner described herein.

80.    GM's data collection practices were deceptive on several different levels. First, GM represented it would only collect driver behavior data if customers opted into, and affirmatively enrolled in its OnStar Smart Driver program. In reality,

detailed driving information was often collected from customers who had not knowingly enrolled in the Smart Driver program and who had not given consent to the collection or sharing of this data.

81.   Second, GM assured customers that even when they enrolled in the Smart Driver Program, their data would only be shared with insurance companies if the customers gave express consent or were participating in a usage-based insurance program. In its website specifically describing the Smart Driver Program, it unambiguously states:

<div style="border:1px solid #ccc;padding:10px;">

— **Does using OnStar Smart Driver impact my car insurance rates?**

Insights about driving behavior are only shared with an insurance carrier with your explicit consent. If you provide consent to your carrier, they can access the driver score associated with your vehicle's driving behavior data to use the information for quoting purposes. The proprietary driver score is generated by LexisNexis or Verisk—GM does not have access to it.

</div>

82.   However, detailed driving data was routinely shared with insurance companies and through data brokers without the customer providing any such express consent.

**E. LexisNexis's and Verisk's Sale of Driver Data to Insurance Companies Further Violates GM's Promise to Safeguard Customer Data.**

83.   LexisNexis Risk Solutions is a self-described "trusted analytics provider for industries around the globe, including financial services, retail/ecommerce, logistics and telecommunications," that can "reach across customer lifecycles to help insurers and automakers streamline business processes"

and "control costs."[22]

84.    LexisNexis offers a "Telematics Exchange" system to automakers like GM, which promises to help automakers' customers get the most from their driving data." As represented on its website:



**LEXISNEXIS® TELEMATICS EXCHANGE**

Help your customers get the most from their driving data

Our device-agnostic telematics exchange receives and normalizes data from connected vehicles, mobile apps and third-party services. The driving behavior data is used to generate scores and attributes that are easily ingested into insurance carrier workflows to influence their value chain.



Learn More

**AUTOMOTIVE OEM EXCHANGE PARTNERS**

Bringing automakers and insurance carriers together

By partnering directly with automotive OEM's, LexisNexis is able to turn connected car data into tangible driving behavior insights that can be leveraged within insurance carriers' existing workflows.

85.    Similarly, Verisk Analytics is a data aggregator that offers multiple products to the automotive industry. In a September 2, 2015, press release, Verisk announced that GM was the "inaugural auto manufacturer to join [its] telematics data exchange," rolled out in 2016.[23] At its first quarter earnings call on May 1, 2024, Verisk announced that it was discontinuing its telematics data exchange, primarily

---

[22] Homepage for LEXISNEXIS.COM, https://risk.lexisnexis.com/ (last accessed May 8, 2024).

[23] *Verisk Insurance Solutions Announces GM as Inaugural Auto Manufacturer to Join Telematics Data Exchange*, VERISK.COM (Sept. 2, 2015), *available at*: https://www.verisk.com/company/newsroom/archive/verisk-insurance-solutions-announces-gm-as-inaugural-auto-manufacturer-to-join-telematics-data-exchange/ (last accessed May 8, 2024).

due to the fact that, according to Verisk CEO Lee Shavel as reported by Coverager, "the entities that were providing that data to us decided to discontinue collecting that data."[24]

86.     LexisNexis and Verisk compile data from the public record as well as data received from connected vehicles and use this data to generate scores and attributes that can be input in insurance carrier workflows to assess risk.

87.     In short, LexisNexis and Verisk sell personal consumer driver behavior data—procured without consumer notice, knowledge, or consent—to automobile insurers to help those insurers increase profitability, which comes at a cost to those drivers' whose data has been misappropriated.

88.     LexisNexis and Verisk obtain driver behavior data from GM and OnStar and furnish it to third parties, including automobile insurers, without Plaintiffs' and other Class Members' authorization, knowledge, or consent.

89.     LexisNexis and Verisk prepared inaccurate, flawed, and materially misleading reports relating to Plaintiffs and Class Members based on driver behavior data collected by GM Defendants.

90.     LexisNexis and Verisk transmit or sell these reports without the authorization of Plaintiffs and Class Members.

---

[24] *Verisk discontinues telematics offering and more*, COVERAGER (May 2, 2024), *available at*: https://coverager.com/verisk-discontinues-telematics-offering-and-more/ (last accessed May 8, 2024).

91.     LexisNexis and Verisk knew or should have known that the sale of driver data would directly harm at least some customers because it would serve as the basis for increasing GM customers' insurance premiums, inflating quotes, denying coverage, or rejecting applications for insurance, which it did.

92.     LexisNexis and Verisk also knew or should have known that the collected driver data could and likely would be inaccurate, flawed, and devoid of context, which it was.

93.     The covertly collected driver data, while extensive, lacks certain critical contextual identifiers. For instance, in situations such as Plaintiffs' where more than one individual drives the vehicle, driving data reports may not accurately reflect the driving habits of the particular driver to whom they are attached; customers who engage in sport driving on a track or who drive on turnpikes or highways with higher speed limits could be flagged as "dangerous drivers" or find their insurance premiums increased dramatically; mechanical malfunctions or settings, which are unchecked, result in inaccurate data.

94.     Thus, the risk reports that LexisNexis and Verisk compile that are based on decontextualized telematics and flawed data are not an accurate representation of the individuals such reports related to.

95.     The procedures implemented by LexisNexis and Verisk do not assure maximum possible accuracy of the information concerning the individual described

in the report.

## PLAINTIFF-SPECIFIC ALLEGATIONS

### A. Plaintiffs Did Not Consent to GM and OnStar Collecting, Sharing, or Selling their Driving Data.

96.     Plaintiffs Manny and Katie Martinez purchased a GMC Yukon in May of 2019. Manny was listed as the buyer, but Katie was the primary driver.

97.     Plaintiffs Manny and Katie Martinez did not knowingly enroll in OnStar services related to their 2019 Yukon.

98.     In September of 2023, Plaintiffs Manny and Katie Martinez traded in their 2019 Yukon for a 2023 GMC Yukon. Manny was listed as the buyer, Katie was listed as co-owner, and Katie was the primary driver of the vehicle.

99.     The 2023 Yukon came with a three-year OnStar services package. At the dealership, GM sales agents put the MyGMC Vehicle App on Plaintiff Katie Martinez's phone, and "got everything running." Plaintiffs were enrolled in OnStar with their 2023 Yukon, but never knowingly enrolled in Smart Driver or Smart Driver+, never knowingly consented to have driving behavior data collected, and never knowingly consented to have driving behavior data shared with unauthorized data brokers or sold to insurance companies.

100.   At all relevant times, Plaintiffs did not receive reports from GM or OnStar regarding their driving behavior data.

101.   At all relevant times, Plaintiffs did not have a "usage-based insurance

plan," i.e., a plan that allows an auto insurer to obtain driving information through an onboard device or mobile application to presumably offer potentially lower rates for good driving. Insurance companies, among other entities, place an extremely high value upon such data.

102.   On information and belief, Plaintiffs' insurance premiums have or will increase as a result of GM's wrongful and unconsented sharing of driver data.

103.   On information and belief, much of the driving data collected and shared is improperly and inaccurately associated with Plaintiff Manny Martinez given that he was not the primary driver of the vehicle.

104.   Driver data of the type collected and sold by GM has independent value, as demonstrated by the fact that data brokers and insurance companies pay for such data. As a result of GM's wrongful and unconsented sharing of their driver data, Plaintiffs have been deprived of the opportunity to control their own data. Plaintiffs and Class Members' data, now sold and widely dispersed, cannot be reclaimed.

105.   At all relevant times, GM knew or should have known that Plaintiffs and the Class did not knowingly consent to their driver data being sold or shared with data brokers or insurance companies.

106.   Defendants understood that this driver data, if provided to insurance companies, would likely be used in ways that would be adverse to its customers. Defendants also knew or should have known that much of the driver data it gathered

painted a fundamentally flawed and incomplete picture of its customers' driving records.

107.   Accordingly, Plaintiffs and Class Members have been injured by Defendants' practices and are owed redress for those injuries.

**B. GM'S Privacy Violations Harmed Plaintiffs and Class Members.**

108.   Plaintiffs and Class Members suffered actual damages because their vehicle driving behavior was shared without their knowledge or consent with third parties, such as their insurance companies, including but not limited to the invasion of their privacy, the sale of their data without just compensation, and adverse action by insurers.

## CLASS ACTION ALLEGATIONS

109.   Plaintiffs bring this action individually and on behalf of all other similarly situated individuals pursuant to Federal Rules of Civil Procedure 23(a), (b)(1), (b)(2), (b)(3), and Plaintiffs seek certification of the following classes:

Nationwide Class: All individuals whose GM-branded vehicle's driving data was collected, stored, distributed, and/or sold by Defendants without their consent.

Kansas Subclass: All residents of Kansas whose GM-branded vehicle's driving data was collected, stored, distributed, and/or sold by Defendants without their consent.

110.   Excluded from the Classes are Defendants, any entity in which Defendant has a controlling interest, any of the officers or directors of Defendants, the legal representatives, heirs, successors, and assigns of Defendants, and any Judge to whom this case is assigned, and his or her immediate family.

111.   The Class Period extends from the date that Defendants began implementing the practices described in this Complaint to the date of entry of judgment.

112.   Plaintiffs' claims described in detail below satisfy the numerosity, commonality, typicality, adequacy, and superiority requirements of a class action pursuant to Fed. R. Civ. P. 23.

113.   <u>Numerosity</u>: The class numbers in the hundreds, if not thousands, of persons.  As a result, joinder of all class members in a single action is impracticable.

114.   All members of the Class are ascertainable by reference to objective criteria, as Defendants have access to names, addresses, and other contact information for Class members that can be used for notice purposes. Class members may be informed of the pendency of this action through regular mail, e-mail, text, and/or posting of an approved notice.

115.   <u>Common Questions of Law and Fact Predominate</u>: There are common questions of fact and law to the classes that predominate over any questions affecting only individual class members and that drive the litigation. The questions of law and

fact common to the classes arising from Defendants' acts and omissions include, without limitation, the following:

a) Whether GM and OnStar collected and tracked Plaintiffs' and the Class Members' driving behavior;

b) Whether Plaintiffs and the Class Members consented to such collection;

c) Whether Plaintiffs and the Class Members consented to have their data shared with LexisNexis, Verisk, or other third parties;

d) Whether LexisNexis or Verisk obtained Plaintiffs' and Class Members' driver behavior data without consent;

e) Whether LexisNexis or Verisk sold Plaintiffs' and Class Members' driver behavior data to third parties without consent;

f) Whether the reports are "inaccurate" within the meaning of § 1681e(b);

g) Whether Defendants followed reasonable procedures to assure maximum possible accuracy of the driving data reports as required by § 1681e(b);

h) Whether Defendants conduct constitutes violations of the Fair Credit Reporting Act;

i) Whether Defendants' conduct constitutes violations of the Federal Wiretap Act;

j) Whether GM Defendants' conduct constituted a breach of its standard contracts with Plaintiffs and Class Members;

k)  Whether Defendants were unjustly enriched;

l)  Whether Defendants' practices constitute an invasion of privacy;

m) Whether Defendants' conduct was knowing and willful;

n)  Whether Defendants are liable for damages, and the amount of such damages; and

o)  Whether Defendants should be enjoined from such conduct in the future.

116.  <u>Typicality</u>: Plaintiffs' claims are typical of those of the class in that all were subject to the same data collection, use, and sharing practices of Defendants.

117.  <u>Superiority</u>: Class treatment is superior to individual treatment, as it will permit a large number of similarly situated persons to prosecute their respective class claims in a single forum, simultaneously, efficiently, and without unnecessary duplication of evidence, effort, and expense that numerous individual actions would produce. Defendants have acted or refused to act on grounds generally applicable to the class. Absent a class action, most of the members of the Class would find the cost of litigating their claims to be prohibitive and would have no effective remedy. Separate actions by individual class members would unnecessarily burden the courts, could create a risk of inconsistent and varying adjudications, establish incompatible standards of conduct for Defendants, and/or substantially impair or impede the ability of class members to protect their interests.

118.  <u>Adequacy</u>: Plaintiffs are adequate representatives because they are

members of the classes they seek to represent, and their interests do not conflict with the interests of the members of those classes. The interests of the members of the classes will be fairly and adequately protected by Plaintiffs and their undersigned counsel, who are experienced prosecuting complex consumer class actions, including in multi-district litigation.

119.   To the extent not all issues or claims, including the amount of damages, can be resolved on a class-wide basis, Plaintiffs invoke Federal Rule of Civil Procedure 23(c)(4), reserving the right to seek certification of a class action with respect to particular issues, and Federal Rule of Civil Procedure 23(c)(5), reserving the right to divide the class into subclasses. To the extent Plaintiffs seek declaratory or injunctive relief, Defendants have acted or refused to act on grounds that apply generally to the class, rendering certification under Rule 23(b)(2) appropriate.

## **TOLLING**

120.   All applicable statute(s) of limitations have been tolled by Defendants' knowing and active concealment and denial of the facts alleged herein. Plaintiff and Class Members' causes of action could not have and did not accrue until shortly before the filing of this action, because Plaintiffs and Class Members could not have reasonably discovered Defendants' practice of covertly collecting, recording, using, sharing, and profiting from driving behavior data until shortly before this class action litigation began.

## COUNT I

### Violation of the Federal Wiretap Act, 18 U.S.C. § 2510, *et seq.*

*On Behalf of Plaintiffs and Class Against All Defendants*

121.   Plaintiffs re-allege the allegations set forth above.

122.   The Federal Wiretap Act, 18 U.S.C. § 2510, *et seq.*, prohibits the interception of any wire, oral or electronic communications. The statute confers a civil cause of action on "any person whose wire, oral, or electronic communication is intercepted, disclosed, or intentionally used in violation of this chapter." 18 U.S.C. § 2520(a).

123.   Electronic Communications. The communications between Plaintiff and Class Members and OnStar's systems are "transfer[s] of signs, signals, writing, . . . data, [and] intelligence of [some] nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photooptical system that affects interstate commerce" and are therefore "electronic communications" within the meaning of 18 U.S.C. § 2510(12).

124.   Content. The ECPA defines content, when used with respect to electronic communications, to "include[] any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(8).

125.   Interception. The ECPA defines interception as the "acquisition of the contents of any wire, electronic, or oral communication through the use of any

electronic, mechanical, or other device" and "contents . . . include any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(4), (8).

126. Electronic, Mechanical, or Other Device. The ECPA defines "electronic, mechanical, or other device" as "any device . . . which can be used to intercept a[n] . . . electronic communication[.]" 18 U.S.C. § 2510(5). The following constitute "devices" within the meaning of 18 U.S.C. § 2510(5): (a) GM's and OnStar's software and servers; (b) LexisNexis' electronic servers; (c) Verisk's electronic servers.

127. Without Plaintiffs' or Class Members' knowledge or consent, LexisNexis and Verisk intercepted the contents of Plaintiffs' electronic communications when Plaintiffs operated their GM-manufactured vehicles with OnStar capabilities.

128. LexisNexis and Verisk intentionally used technology as a means of intercepting and acquiring the contents of Plaintiffs' and Class Members' electronic communications, in violation of the Wiretap Act.

129. LexisNexis and Verisk intentionally intercepted Plaintiffs' and Class Members' information in transit. LexisNexis and Verisk intercepted Plaintiffs' and Class Members' communications with OnStar, aided and abetted by GM, whenever Plaintiffs' and Class Members' vehicles communicated vehicle behavior data,

38

location data, and other electronic communications to OnStar's servers. These communications—which comprise the transfer of signs, signals, writing, images, sounds, data, and/or intelligence transmitted in whole or in party by wire, radio, electromagnetic, photoelectric, or photo-optical system—constitute "electronic communications" under the Wiretap Act and were contemporaneously copied by LexisNexis and Verisk in real time.

130.   Plaintiffs' and Class Members' driving-behavior data and location data was content as defined by the Wiretap Act as it involves the substance and import of Plaintiffs' communications with OnStar and not simply routine identifiers or metadata.

131.   Plaintiffs and Class Members were not aware that LexisNexis and Verisk were intercepting its users' electronic communications and tracking their telematic vehicle data. Plaintiffs and Class Members did not consent to Defendants' collection of their driving-behavior data. Additionally, the nature and scope of the tracking and collection of information at issue goes beyond what a reasonable consumer would anticipate when operating a vehicle.

132.   By intentionally disclosing or endeavoring to disclose the electronic communications of Plaintiffs and Class Members to affiliates and other third parties, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. §

2511(1)(a), Defendants violated 18 U.S.C. § 2511(1)(c).

133.   By intentionally using, or endeavoring to use, the contents of the electronic communications of Plaintiffs and Class Members, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendants violated 18 U.S.C. § 2511(1)(d).

134.   Plaintiffs and Class Members are persons whose electronic communications were intercepted within the meaning of Section 2520. As such, they are entitled to preliminary, equitable and declaratory relief, in addition to statutory damages of the greater of $10,000 or $100 per day for each day of violation, actual damages, punitive damages, and reasonable attorneys' fees and costs of suit.

## COUNT II

**Violation of the Fair Credit Reporting Act, 15 U.S.C. § 1681e(b)
Failure to Follow Reasonable Procedures to
Assure Maximum Possible Accuracy**

*On Behalf of Plaintiffs and Class Against LexisNexis and Verisk*

135.   Plaintiffs re-allege the allegations set forth above.

136.   Defendants LexisNexis and Verisk are "person[s]" and "consumer reporting agenc[ies]" subject to the Fair Credit Reporting Act, 15 U.S.C. §1681 et seq. ("FCRA"), and they produce "consumer report[s]" as defined by the FCRA. See 15 U.S.C. § 1681a(b), (f), and (d).

137.   Plaintiffs and Class Members are "consumers" as defined by 15 U.S.C. §1681a(c).

138.   The FCRA mandates that "[w]henever a consumer reporting agency prepares a consumer report it shall follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates." 15 U.S.C. § 1681e(b).

139.   Whenever a consumer reporting agency prepares a consumer report it "shall follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates." 15 U.S.C. § 1681e(b).

140.   LexisNexis's and Verisk's provision of credit information that includes driver behavior data to third parties, including automobile insurance companies, constitutes the furnishing of consumer reports under the FCRA and an impermissible purpose and use of data under the FCRA.

141.   LexisNexis and Verisk have knowingly and willfully engaged in the collection and production of inaccurate data metrics regarding Plaintiffs' and Class Members' driving abilities.

142.   LexisNexis and Verisk, acting as consumer reporting agencies as defined by 15 U.S.C. § 1681c(1), have failed to implement procedures to maintain maximum possible accuracy regarding Plaintiffs' and the Class Members' driving

data.

143.   As a result of LexisNexis's and Verisk's conduct, insurance carriers and others who view these consumer reports receive and in turn rely on an inaccurate representation of Plaintiffs' and Class Members' driving abilities.

144.   The foregoing deceptive acts and practices constitute reckless and/or negligent violations of the FCRA, including, but not limited to, 15 U.S.C. § 1681e(b).

145.   As a result of each and every negligent noncompliance of the FCRA, Plaintiffs and Class Members are entitled to actual damages as the Court may allow pursuant to 15 U.S.C. § 1681o(a)(1); and reasonable attorneys' fees and costs pursuant to 15 U.S.C. § 1681o(a)(2) from Defendants.

146.   In addition, LexisNexis and Verisk's conduct was "willful" in that their actions or inactions "created an unjustifiably high risk of harm."

147.   As a result of each and every willful violation of the FCRA, Plaintiffs and Class Members are entitled to actual damages as the Court may allow pursuant to 15 U.S.C. §1681n(a)(1). Plaintiffs are also entitled to statutory damages pursuant to 15 U.S.C. § 1681n(a)(1); punitive damages as the Court may allow pursuant to 15 U.S.C. § 1681n(a)(2); and reasonable attorneys' fees and costs pursuant to 15 U.S.C. § 1681n(a)(3) from Defendants.

## COUNT III

### Breach of Contract

*On Behalf of Plaintiffs and Classes Against GM and OnStar*

148.   Plaintiffs re-allege the allegations set forth above.

149.   The GM Privacy Policy, incorporated by the User Terms, is a valid contract between GM and Class Members, purchasers and users of GM vehicles, to which both parties agreed and into which both parties entered when a Class Member purchased a GM vehicle or used GM's OnStar services.

150.   Plaintiffs and Class Members accepted the terms of the contract when they purchased a GM vehicle or enrolled in OnStar, and provided consideration to GM through the purchase or use of the vehicle by which GM obtained this consideration.

151.   The terms of the contract, as described herein did not allow or reasonably contemplate GM's sale of the driving behavior data to a third party, including for use by that third party for determination of insurance premiums, without express and knowing consent.

152.   GM has violated and breached the terms of the GM Privacy Policy by selling identifiable, driver specific driving behavior data to third parties for money for purposes unrelated to the services and products provided to the vehicle owner.

153.   The sale of the driving behavior data was not related to developing,

enhancing, providing, servicing, maintaining, and improving the safety, security, and quality of GM's products, programs, and services.

154.   By selling the driving behavior data to third parties who had a relationship with GM but who were not engaged in providing, servicing, maintaining, and improving the safety, security, and quality of GM's products, programs, and services, GM has breached its obligations under the GM Privacy Policy, or the contract, and did not fulfill the terms of the GM Privacy Policy.

155.   Plaintiffs and Class Members have been damaged by GM's breach of its obligations under the GM Privacy Policy by one or more of the following: (1) causing Plaintiffs and Class Members to pay higher insurance premiums for vehicle insurance; (2) preventing some Class Members from obtaining reasonably priced or any vehicle insurance; (3) causing Plaintiffs and Class Members the loss and diminution of the value of their personal, identifiable driving behavior data which has a value as GM was able to sell such information for millions of dollars; and (4) causing Plaintiffs and Class Members to overpay for their GM vehicle and OnStar or Connectivity services which failed to provide them with the promised security of their driving behavior data.

156.   As a result of GM's and OnStar's breach of contract, Plaintiffs and Class Members are entitled to damages in an amount to be proven at trial.

## COUNT IV

**Unjust Enrichment**

*On Behalf of Plaintiffs and Class Against All Defendants*

157.   Plaintiffs re-allege the allegations set forth above.

158.   Plaintiffs and the Class Members owned or leased or drove vehicles equipped with telematics services provided by GM and OnStar, which collected extensive personal driving data, including but not limited to, locations, speeds, braking and acceleration activity, and other driving behaviors, all without the informed consent of Plaintiffs and the Class Members.

159.   GM and OnStar, without the consent or knowledge of Plaintiffs and Class Members, sold this highly personal and proprietary driving data to LexisNexis and Verisk.

160.   Upon receiving Plaintiffs' and Class Members' data from GM and OnStar, LexisNexis and Verisk used this data for various commercial purposes, including but not limited to the creation of consumer reports that were sold and disseminated to third parties, such as insurance companies, generating substantial revenue for LexisNexis and Verisk.

161.   GM, OnStar, LexisNexis, and Verisk have unjustly enriched themselves by commercially exploiting Plaintiffs' and Class Members' proprietary driving data, directly at the expense of Plaintiffs' and Class Members' privacy and

financial interests.

162.   Defendants' appropriation of Plaintiffs' and Class Members' driving data constitutes the direct conferral of a benefit without just compensation.

163.   Plaintiffs and the Class Members did not freely or knowingly allow Defendants to exploit their personal and proprietary data for commercial gain. If Plaintiffs and the Class Members had been informed of Defendants' intentions to profit from their personal driving data, they would not have consented to such use.

164.   The enrichment of Defendants at the expense of Plaintiffs and the Class Members is against equity and good conscience. Defendants' retention of the benefits without proper compensation to Plaintiffs and the Class Members is unjust and warrants restitution.

165.   As a direct and proximate result of Defendants' unjust enrichment, Plaintiffs and the Class Members have suffered damages and have been deprived of the economic value of their personal and proprietary information.

166.   Plaintiffs and Class Members have no adequate remedy at law.

## COUNT V

### Invasion of Privacy

*On Behalf of Plaintiffs and Classes Against All Defendants*

167.   Plaintiffs re-allege the allegations set forth above.

168.   Plaintiffs and Class Members have a common law, legally- and/or

constitutionally-protected privacy interest in the data described herein and are entitled to the protection of their information and property against unauthorized access.

169.   Plaintiffs and Class Members have a reasonable expectation of privacy in their driving abilities, habits, patterns, and behavior engaged in while they are in their own vehicles, and in any compilation of highly personalized driving behavior profile resulting from collection of such data.

170.   Based at least in part on GM's own user terms and privacy policies, as well as website and other representations as described herein, Plaintiffs and Class Members have a reasonable expectation that driving behavior data would not be collected by GM without their express consent, and that such data would not be shared with or sold to third parties without their express consent.

171.   Without the consent or knowledge of Plaintiffs and Class Members, GM and OnStar collected comprehensive driving data, including but not limited to locations, speeds, braking and acceleration events, seatbelt usage, and other sensitive information that Plaintiffs and Class Members expected to remain private.

172.   GM and OnStar then disclosed this highly personal and sensitive information to LexisNexis and Verisk, who further disseminated it to third parties, including insurance companies, for commercial gain.

173.   This data was flawed, inaccurate, and erroneous.

174.   Defendants' actions intentionally and unlawfully invaded the privacy rights of Plaintiffs and Class Members and intruded upon the solitude, seclusion, and private affairs of Plaintiffs and the Class Members in a manner that would be highly offensive to a reasonable person.

175.   In sharing Plaintiffs and Class Members' inherently inaccurate telematics information, Defendants acted in reckless disregard of Plaintiffs' and Class Members' privacy rights, intentionally and unlawfully intruded into their seclusion, publicly disclosed their private data, and publicly disclosed private data that was false or inaccurate.

176.   Defendants' conduct is highly objectionable to a reasonable person and constitutes an egregious breach of social norms underlying the right to privacy.

177.   As a direct and proximate result of Defendants' unlawful invasions of privacy, Plaintiffs and Class Members' private, personal, and confidential information has been accessed or is at imminent risk of being accessed, and their reasonable expectations of privacy have been intruded upon and frustrated. Plaintiffs and Class Members have suffered injuries as a result of Defendants' unlawful invasions of privacy and are entitled to appropriate relief.

178.   Plaintiffs and Class Members are entitled to actual damages, punitive damages, and compensatory damages for invasion of their privacy in an amount to be determined by a jury at trial.

## COUNT VI

### Violation of the Kansas Consumer Protection Act, K.S.A. §§ 50-623, et seq.

*On Behalf of Plaintiffs and Kansas Subclass Against GM and OnStar*

179.   Plaintiffs re-allege the allegations set forth above.

180.   K.S.A. §§ 50-623, *et seq.* is to be liberally construed to protect consumers from suppliers who commit deceptive and unconscionable practices.

181.   Plaintiff and Kansas Subclass members are "consumers" as defined by K.S.A. § 50-624(b).

182.   The GM Defendants are "suppliers" as defined by K.S.A. § 50-624(l).

183.   The acts and practices described herein are "consumer transactions," as defined by K.S.A. § 50-624(c)

184.   GM Defendants advertised, offered, or sold goods or services in Kansas and engaged in trade or commerce directly or indirectly affecting the people of Kansas.

185.   GM Defendants engaged in deceptive, unfair, and unconscionable acts or practices, including omitting, suppressing, and concealing material facts related to GM Defendants' practices of collecting, using, sharing, and selling Plaintiffs' and the Kansas Subclass members' personal driver behavior data without their consent.

186.   The GM Defendants' omissions were material because they were likely to deceive reasonable consumers about the security of their personal driver behavior

data and unauthorized third parties access to the same.

187.  GM Defendants intended to mislead Plaintiff and Kansas Subclass members and induce them to rely on its omissions.

188.  Plaintiff and Kansas Subclass members conferred a benefit on Defendant—the purchase of GM-branded vehicles and their valuable telematics data—in reliance on Defendants' omissions. Had Defendants disclosed in any form, whether verbally, in writing, or via electronic disclosure that they would be collecting, recording, using, sharing, and/or selling Plaintiffs' driver behavior, including to third parties and auto insurers, without their knowledge or consent, Plaintiffs and Kansas Subclass members would not have sought or purchased products or services from Defendants.

189.  Defendant also engaged in unconscionable acts and practices in connection with a consumer transaction, in violation of K.S.A. § 50-627, including:

    a.  Knowingly taking advantage of the inability of Plaintiffs and Kansas Subclass members to reasonably protect their interests, due to their lack of knowledge, K.S.A. § 50-627(b)(1)); and

    b.  Requiring Plaintiffs and Kansas Subclass members to enter into a consumer transaction on terms that Defendant knew was substantially one-sided in favor of Defendant, K.S.A. § 50-627(b)(5)).

190.  Plaintiffs and Kansas Subclass members had unequal bargaining power

with respect to their ability to control the security and confidentiality of driver behavior data in Defendants' possession.

191.   The above unfair, deceptive, and unconscionable practices and acts by Defendants were immoral, unethical, oppressive, and unscrupulous. These acts caused substantial injury to Plaintiffs and Kansas Subclass members that they could not reasonably avoid; this substantial injury outweighed any benefits to consumers or to competition.

192.   As a direct and proximate result of the GM Defendants' unfair, deceptive, and unconscionable trade practices, Plaintiffs and Kansas Subclass members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including loss of the benefit of their bargain with Defendants as they would not have paid Defendants for goods and services or would have paid less for such goods and services but for Defendant's violations alleged herein; losses from the permanent loss and lost control of their personal and valuable driver behavior data; costs of increasing insurance premiums; time and expenses related to requesting and reviewing consumer reports and monitoring their personal data.

193.   Plaintiffs and Kansas Subclass members seek all monetary and non-monetary relief allowed by law, including civil penalties or actual damages (whichever is greater), under K.S.A. §§ 50-634 and 50-636; injunctive relief;

restitution; and reasonable attorneys' fees and costs.

## **PRAYER FOR RELIEF**

WHEREFORE, as to each Count alleged, Plaintiffs individually and on behalf of all those similarly situated respectfully request that the Court enter judgment in their favor and against Defendants and pray this Court:

 a. Certify this action as a class action pursuant to Fed. R. Civ. P. 23, declare Plaintiffs proper Class Representatives, and appoint Plaintiffs' counsel as Class Counsel;

 b. Declare that Defendants' conduct as set forth above violates the law cited herein;

 c. Order injunctive relief including but not limited to ordering Defendants to delete all driver data of Plaintiffs and Class Members, to discontinue collection, recording, and sharing of driving data in GM vehicles, and to implement procedures to require consent before recording, using, sharing, or selling their data;

 d. Award Plaintiffs and the Class damages, along with liquidated damages and statutory penalties and all damages available at law, including punitive damages including those pursuant to 15 U.S.C. § 1681n(a)(2) and 18 U.S.C. § 2520(b), in an amount to be determined at trial;

 e. Order the payment of pre- and post-judgment interest to the extent it is

allowed by law;

f.   Award Plaintiffs and the Class Members' their attorneys' fees and costs

of litigation as provided by law; and

g.   Award Plaintiffs and the Class such other relief as the Court deems fair

and equitable.

## JURY DEMAND

Plaintiffs are entitled to and demand a jury trial on all claims so triable.

Dated: May 8, 2024                    Respectfully submitted:

                                      /s/  E. Powell Miller
                                      E. Powell Miller (P39487)
                                      Emily E. Hughes (P68724)
                                      **THE MILLER LAW FIRM, P.C.**
                                      950 W. University Drive, Suite 300
                                      Rochester, MI 48307
                                      Tel: (248) 841-2200
                                      epm@millerlawpc.com
                                      eeh@millerlawpc.com

                                      **STUEVE SIEGEL HANSON LLP**
                                      Norman E. Siegel, MO #44378
                                      Jordan A. Kane, MO #71028
                                      460 Nichols Road, Suite 200
                                      Kansas City, Missouri 64112
                                      Telephone: (816) 714-7100
                                      Facsimile: (816) 714-7101
                                      siegel@stuevesiegel.com
                                      kane@stuevesiegel.com

                                      ***Attorneys for Plaintiffs***
                                      ***and the Putative Class***